# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 11-523


**JULIE C. WHITE, ET VIR.**

**VERSUS**

**LUCAS STRANGE, ET UX.**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
PINEVILLE CITY COURT
PARISH OF RAPIDES, DOCKET NO. 90,143
HONORABLE F. RAE SWENT, JUDGE AD HOC
\*\*\*\*\*\*\*\*\*\*


**SYLVIA R. COOKS**
**JUDGE**


\*\*\*\*\*\*\*\*\*\*


Court composed of Sylvia R. Cooks, James T. Genovese, and Phyllis M. Keaty, Judges.


**AFFIRMED**.

**Susan Ford Fiser**
**1630 Metro Drive**
**P.O. Box 12424**
**Alexandria, LA 71315-2424**
**(318) 442-8899**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
  **Julie C. and James White**

**Robert G. Nida**
**Gold, Weems, Bruser, Sues & Rundell**
**2001 MacArthur Drive**
**P.O. Box 6118**
**Alexandria, LA 71307-6118**
**(318) 445-6471**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
  **Lucas and Sheri Strange**

**Richard E. Lee**
**810 Main Street**
**Pineville, LA 71360**
**(318) 448-1391**
**COUNSEL FOR DEFENDANT/APPELLEE:**
          **Cindy English**

**COOKS, Judge.**

This appeal involves a suit on a contract to buy and sell real estate. The prospective buyers in this case attempted to terminate the contract to buy the property. Finding the parties entered into a valid and binding agreement to buy and sell property and the seller did not receive a timely written notice to cancel the sale from the buyer, the trial court rendered judgment in favor of the sellers. This appeal followed.

## FACTS AND PROCEDURAL HISTORY

The plaintiffs-prospective sellers are Julie and James White and the defendants-prospective buyers are Lucas and Sheri Strange. The home and accompanying property located in Pineville, Louisiana, is titled in the name of Julie Converse Baker, who purchased the property before her marriage to James White. The Stranges both signed the buy and sell agreement on December 3, 2008. Julie Converse Baker White signed the buy and sell agreement on December 4, 2008.

The buy and sell agreement contained certain standard provisions for the buyer's right of inspection. The buyer had an eight-day inspection period, beginning on the day after the buy and sell agreement was signed. If the buyer was not satisfied with the condition of the property, the buyer had the following options: (1) elect, in writing, to terminate the agreement and declare it null and void, or (2) indicate in writing the deficiencies and desired remedies from the seller. The seller then has seventy-two hours in which to respond in writing to indicate any willingness to remedy the deficiencies. If the seller declines to remedy some or all of the problems, the buyer then has a seventy-two hour period to (1) accept the seller's response; (2) accept the current condition of the property; or (3) elect to terminate the agreement. The buy and sell agreement also provides that the buyer's failure to make an inspection or failure to respond in writing

within the eight-day period shall be deemed an acceptance of the current condition of the property.

The inspection period for the property in question was December 5, 2008 through December 12, 2008. An inspection of the property was performed by Daniel Tarver on December 6, 2008. The report contained the following pertinent comments: "The retaining wall is leaning. I also noted wood rot on several of the landscape timbers."

After reading the inspection report, Mr. Strange, who had a mechanical engineering degree, was concerned over the problems with the retaining wall. He believed repairs of the wall would be costly, and questioned whether he wanted to incur such an expense. The Stranges' real estate agent, Angie Sikes, informed Cindy English, the White's real estate agent, of the Stranges' concerns and the possibility they might seek to terminate the buy and sell agreement.

Ms. English then requested a second inspection report on the retaining wall. Mr. Tarver inspected the property a second time and reported that the retaining wall was intact and there was no erosion. He noted maintenance and eye appeal could be improved for approximately $5,000.00 to $6,000.00.

Following this report, on December 9, 2008, the Stranges sent to Sikes an e-mail asserting they wished to terminate the contract and declare the contract null and void. They stated the "decision was made due to the uncertainty of the structural soundness of the retainer wall and the potential damage that could be caused." Sikes then forwarded this e-mail to Brad Youngblood, a loan officer who was working with the Stranges, who acknowledged receipt of the e-mail. Ms. Sikes also asserted she forwarded a copy of the e-mail to English, but English denied ever receiving the e-mail. There was a previous incident acknowledged by both Sikes and English, involving an e-mail that was sent by Sikes that English could not open. A copy of the e-mail was then faxed to English.

2

Sikes and English testified they had a conversation on December 9, 2008. In that conversation, Sikes maintained she had gotten confirmation from English that she had received the e-mail. Sikes believed she had made a written notation of that fact, but her notes did not bear that out. English stated she was with Tarver at the second inspection when she was called by Sikes. According to English, she was told by Sikes that the Stranges were considering terminating the contract, and English would get something from her as soon as possible.

The record confirms on December 14, 2008, Sikes e-mailed a request to English to forward her a copy of the December 9, 2008 inspection report on the retaining wall. That report was faxed by English to Sikes that day. On December 15, 2008, the Stranges sent to English a "Buyers Response to Inspection" (which was a standard form), indicating there was a deficiency in the retaining wall. Julie White immediately responded that they would repair or remedy the complaint. Despite this offer to remedy the complaint, the Stranges did not proceed with the closing.

On December 29, 2008, the Stranges sent an "Agreement to Terminate and/or Release of Deposit" to the Whites. The Whites refused to return the deposit. The $4,000.00 deposit remained with Perego Realty.

The Whites filed suit against the Stranges for damages suffered, alleging they defaulted on an agreement to purchase the property. The Stranges filed a third party demand against Perego Realty and Cindy English as the authorized agents for the Whites.

The matter went to trial. The Stranges argued their December 9, 2008 e-mail to Sikes constituted a "writing" sufficient to legally terminate the buy and sell agreement. At the close of trial, the trial judge took the matter under advisement. Shortly thereafter and before rendering a decision, the trial judge passed away, and the matter was transferred to another judge. After reviewing the record, that judge

3

then rendered written reasons finding the parties entered into a valid and binding agreement to buy and sell the property, and there was no timely writing to cancel the sale. Further, the trial judge noted there was no refusal by the sellers to repair the deficiencies listed in the inspection report. Judgment was rendered in favor of the Whites, and awarding damages in the amount of $22,320.00, a forfeit of the $4,000.00 deposit and $7,500.00 in attorney fees.

The Stranges contend on appeal that the termination of the buy and sell agreement was valid and that the court erred in ruling in favor of the Whites. In the alternative, the Stranges argue even if it were found they did not validly terminate the buy and sell agreement, the trial court's erred in awarding damages to the Whites.

## ANALYSIS

### I. *Was the Buy and Sell Agreement Validly Terminated?*

As they did below, the Stranges argue the Louisiana Uniform Electronic Transactions Act, La.R.S. 9:2601-2620, is applicable and allows for the use of an e-mail to validly terminate the buy and sell agreement in this case. Under the facts of this case, we do not agree.

Louisiana Revised Statutes 9:2605B(1) provides the Act applies "only to transactions between parties, each of which has agreed to conduct transactions by electronic means." Under La.R.S. 9:2605B(2), no formal agreement is needed, but "the context and surrounding circumstances, including the conduct of the parties, shall determine whether the parties have agreed to conduct a transaction by electronic means." In finding there was no formal agreement nor any conduct of the parties indicating an agreement to use electronic transmissions, the trial court reasoned:

> This court has no difficulty in finding that the parties have agreed in this case to the use of a facsimile machine. Under the Buy-Sell Agreement, the parties are permitted to send documents by fax,

4

but original signatures "shall" be submitted to the listing agent. Then, the parties may use other electronic means for any supplement addendum or modification to the Acceptance. No reference to the Uniform Act is required for anything having to do with the Acceptance. There was no supplement, addendum or modification, although the testimony showed that the buyers made multiple verbal requests, such as beginning a wall and early occupancy.

Even if this clause was sufficient to invoke the "Act," these parties had no regular use of any electronic transmission, other than fax. While Sikes and her client may have used email, there is only one reference in the testimony to Sikes and English using email before the 9th and that was not a successful use. The court believes that Sikes believed that English told her she got the email; however, Sikes, knowing the email was sent, believed there was more to her conversation with English than was actually said. It is not uncommon for two parties to have a conversation about an event and not understand one had more information than the other. The notes that Sikes made only referenced whether or not the Whites "knew" something and did not contain any reference to the email.

The conduct of the parties did not give any indication that the Whites or English did or would agree to the use of a forwarded email as the means of canceling the Agreement to Buy and Sell. The Court also believes that English did not get the email. Her testimony is somewhat corroborated by the exchange between Youngblood and Daniels on the 12th, to the effect that English did not know until 12th that the closing was not going to take place on the 15th. Even when she learned the closing would not take place, she still did not know the sale would never take place, especially since she received a request for the Tarver report on the 14th and the Buyer's Response on the 15th. According to her testimony, English did not receive any termination notice in writing and, so, she simply believed that Sikes told her the Stranges wanted to terminate as a negotiation tactic. The court does not find this conclusion to be unreasonable.

The court also questions whether cancelling a buy-sell agreement is a situation where it would be appropriate to apply the "Act." This is a real estate transaction and there was testimony from all concerned that realtors are required to use certain contract forms, including the Property Inspection Response forms. In fact, Sikes testified that her Broker instructed her to complete and send the inspection report on the 15th. Thus, while electronic transmissions other than a fax may be convenient for those negotiating the details of everyday business, it would appear that the Louisiana Real Estate Commission believes that certain significant actions should be in a certain form. In fact, on 12/29, Sikes used a pre-printed form to attempt termination and return of the deposit. This document appear to be the type of form that could be used for termination, but, in this

case, the document came too late. There was no "writing" sufficient to cancel the contract on or by the 12th of December.

We find no error in the trial judge's reasoning in support of her finding that the Stranges failed to timely terminate the buy and sell agreement.

We also note in the Listing Agreement, completed by English and signed by Julie White, the box that states "Seller authorized the authentication of his signature or of the Purchaser's by facsimile (fax) or e-mail" was left unchecked. This contradicts the Stranges' contention that e-mail was authorized by the parties in this case.

Further, the record indicates, as late as December 14, 2008, Sikes was still requesting inspection reports and appraisals from English, which gave English no reason to believe the Stranges were not still negotiating details of the purchase of the house. Sikes herself testified that on December 15, 2008, the Stranges were still asking for reports and for things to be repaired and changed at the house. English testified on December14, 2008, she called Sikes to inform her that Kevin Bell, the foundation repair person, was meeting her at the house, and she would forward his report to Sikes as soon as she received it. According to English, Sikes responded "okay," further leading English to believe the agreement to buy and sell had not been terminated. The record clearly establishes the conduct of the Stranges and Sikes does not reflect that of parties who believed the buy and sell agreement had been terminated.

## II. Damages.

Finding the parties entered into a valid and binding buy and sell agreement, and under Option 1 of the agreement there was no timely writing to cancel the sale and, under Option 2, the sellers did not refuse to repair the deficiencies listed on the Buyers Response to Property Inspection Report, the trial judge found the sellers were entitled to damages. The trial judge noted the Agreement provided for stipulated damages in the amount of ten percent (10%) of the purchase price

6

($22,320.00), forfeiture of the deposit ($4,000.00), and attorney fees ($7,500.00). Thus, the only amount which was subject to any discretion was the trial judge's award of attorney fees. The trial judge did not accept the Whites' arguments below that the Stranges were in bad faith and they should be liable for actual damages.

The Stranges' assignment of error, asserting the trial judge should have ordered Perego Realty to refund the $4,000.00 deposit to them, was premised on its belief that the buy and sell agreement was properly terminated. Finding no error in the trial court's ruling that the agreement was not properly terminated, this assignment of error has no merit.

As to the award of damages in the amount of $22,320.00, we find the trial court correctly applied the stipulated amount of damages listed in the buy and sell agreement. The law is established that parties to a contract may stipulate damages to be recovered in case of non-performance. *See* La.Civ.Code art. 2005. A stipulated damage clause fixes the amount of damages that may be recovered for breach of contract. *Nesbitt v. Dunn*, 28,240 (La.App. 2 Cir. 4/3/96), 672 So.2d 226.

We also find no abuse of discretion in the trial court's award of $7,500.00 in attorney fees. The buy and sell agreement provided for attorney fees in the case of non-performance, and the trial court provided facts and figures for setting the amount it did.

### DECREE

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed against appellants, Lucas and Sheri Strange.

**AFFIRMED.**

7