| | | |
|---|---|---|
| IV WASTE, LLC | * | NO. 2023-CA-0610 |
| VERSUS | * | |
| | | COURT OF APPEAL |
| JIM HOTARD PROPERTIES, LLC | * | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

* * * * * * *

APPEAL FROM
ST. BERNARD 34TH JUDICIAL DISTRICT COURT
NO. 20-1108, DIVISION "A"
Honorable William M. McGoey, Judge
* * * * * *
**Judge Dale N. Atkins**
* * * * * *

(Court composed of Judge Daniel L. Dysart, Judge Sandra Cabrina Jenkins, Judge Paula A. Brown, Judge Dale N. Atkins, Judge Rachael D. Johnson)

**JENKINS, J. DISSENTS**

Gregory J. Noto
NOTO LAW FIRM
532 East Judge Perez Drive, Suite 102
Chalmette, LA 70043

      COUNSEL FOR PLAINTIFF/APPELLEE, IV Waste, L.L.C.

Vallerie Lynn Oxner
3500 N. Hullen Street, Suite 17-A
Metairie, LA 70005

      COUNSEL FOR DEFENDANT/APPELLANT, Jim Hotard Properties, LLC

**AFFIRMED IN PART; VACATED IN PART; AND REMANDED**
**SEPTEMBER 17, 2024**

*DNA*

*DLD*

*PAB*

*RDJ*

This is a breach of contract action. Appellant, Jim Hotard Properties, LLC ("Hotard Properties"), seeks review of the trial court's July 12, 2023 judgment, which held Hotard Properties liable to Appellee, IV Waste, LLC ("IV Waste"), for breach of contract. Additionally, the July 12, 2023 judgment awarded $13,913 in lost profits and consequential damages to IV Waste. The July 12, 2023 judgment also awarded attorney fees to IV Waste, but the judgment did not specify the amount and, instead, stated that it would be determined at a later date. For the following reasons, we affirm the July 12, 2023 judgment in part; we vacate the judgment in part; and we remand this matter for further proceedings consistent with this Opinion.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### Petition for Damages

On October 5, 2020, IV Waste, filed a Petition for Damages ("Petition") in the Thirty-Fourth Judicial District Court for the Parish of St. Bernard, which named Hotard Properties as the defendant. The Petition alleged that IV Waste and Hotard Properties entered into "Standard Services Contracts for Non-Hazardous Non-Industrial Waste" (collectively "Contracts") on or around April 6, 2018, and October 1, 2018, for properties located at 1434 St. Andrew Street, New Orleans,

LA 70130 ("St. Andrew Street Property") and 4028 Rye Street, Metairie, LA 70002 ("Rye Street Property"), respectively.[1] IV Waste further alleged that these contracts were each for five-year terms and that the contracts outlined an agreement by which "IV Waste agreed to provide[] and [Hotard Properties] agreed to accept certain equipment and services having to do with waste and debris collection removal" (i.e., garbage pickup).

The Petition contended that "[t]he Contracts require[d] [Hotard Properties to] provide proper '[a]ccess' such that IV Waste [would be] able to perform its obligations under the [C]ontract[s]." The Petition provided that Article I, Section (e) of the Contracts was titled "Access," and the Petition quoted that provision ("Access Provision") as stating:

> Access. Customer grants Contract[or] a right of access to its designated equipment locations and warrants the sufficiency of such right of way over and between the public way and equipment locations. Customer acknowledges that it is directing Contractor to perform these activities, and that Customer warrants that Customer's pavement, curbing, or other driving surface or any right of way reasonably necessary for Contractor to provide the services described herein are sufficient to bear the weight of all Contractor's equipment and vehicles reasonably required to perform such services. Contractor will not be responsible for damage to any such pavement, curbing, driving surface or right of way, and Customer agrees to assume all liabilities for any such damages, which results from the weight of Contractor's vehicles providing service at Customer's location. Customer agrees to indemnify and hold harmless the Contractor for damage to private or public paving, curbing, aprons, or subsurface installations of any route used to perform the services covered by this Agreement. Customer may, at Contractor's discretion, be assessed an

---

[1] We note that IV Waste also alleged in the Petition that the parties entered a contract for the same equipment and services at 2217 Lapeyrouse Street, New Orleans, LA 70119 ("Lapeyrouse Property"). However, in the July 12, 2023 Judgment, the trial court found that the contracting entity relative to the Lapeyrouse Property, Elderly Housing of America, LLC, had not been named a party to the suit. Accordingly, the trial court concluded that the claims asserted by IV Waste as to the Lapeyrouse Property failed. The Lapeyrouse Property is not at issue in this appeal.

extra pick-up charge when said right of way is obstructed and prevents Contractor's normal service.

Discussing the above Access Provision, IV Waste alleged that it "was damaged in trying to perform its obligations under the [C]ontracts because of improper access to" its waste collection containers at the St. Andrew Street and Rye Street Properties and that the lack of proper access constituted a breach of the Contracts by Hotard Properties. IV Waste further alleged that it had "made several attempts to accommodate" Hotard Properties, yet "the continued improper access not only prevented [IV Waste] from fully providing removal services, but caused significant damages to IV Waste and it equipment."

***Photocopies of the Contracts***

Attached to its Petition, IV Waste provided photocopies of the St. Andrew Street Contract and the Rye Street Contract. Of note, the first page of the St. Andrew Street Contract listed the monthly service charge as $105; and the first page of the Rye Street Contract listed the monthly service charge as $75. The first page of the St. Andrew Street Contract listed the start date as April 6, 2018, while the first page of the Rye Street Contract listed the start date as October 2, 2018. The first page of the Rye Street Contract contained a "One Time Fees" section, which contained boxes to be checked off for delivery, removal, exchange, and lock change fees. Though the box is checked off and a handwritten notation of "$50" appears next to the delivery fee box, the box next to the $100 removal fee was not selected.[2] Additionally, the first page of the St. Andrew Street Contract contained a handwritten notation that stated: "Driver can not [sic] pull truck on the property, [container] must be wheeled to the street."

---

[2] The St. Andrew Street Contract did not contain a similar "One Time Fees" section.

The first page of both Contracts provided that each property would have one container. The second page of both Contracts contained "Article I – Specific Provisions," which included the above-quoted Access Provision, as well as a provision titled "Default & Remedies" ("Default Provision"). The Default Provision provided:

> Customer is in default if payments are not made timely, fails to perform any obligation herein, makes an assignment for the benefit of creditors, or files a petition in bankruptcy. In the event of Customer's default, Contractor may terminate this agreement without notice, demand, or legal process and shall have immediate access to remove any equipment provided pursuant to this Agreement without liability for any damages occasioned by the repossession. Customer is responsible for the costs and expenses of its default, and Contractor's lost profits and consequential damages, including cost of collection and reasonable attorney[] fees. After notice, Contractor may immediately suspend or terminate service for failure to make any required payment on time until account is made current, without credit to the account balance.

Additionally, on the second page of the Contracts under Article I – Specific Provisions, was a section titled "Term" ("Term Provision"). The Term Provision stated: "Unless agreed in writing, this Agreement's term is five (5) years from the Service Commencement Date on the front and is renewed for successive . . . terms unless either party gives a written termination notice by certified mail ninety (90) days before a term's expiration."

*November Letters*

In addition to the photo copies of the Contracts, IV Waste attached a copy of a letter dated November 11, 2019 regarding the St. Andrew Street Property ("November St. Andrew Street Letter") and a copy of a letter dated November 11, 2019 regarding the Rye Street Property ("November Rye Street Letter") (collectively "November Letters"). The November Letters were addressed to Hotard Properties' attorney and stated that IV Waste was "disappointed to learn

4

that [Hotard Properties] wishe[d] to continue [its] efforts to cancel [IV Waste's] services." The November St. Andrew Street Letter explained that, as of the date of the letter, the St. Andrew Street Contract had 41 months remaining until its expiration. The November St. Andrew Street Letter stated that if Hotard Properties continued in its efforts to cancel the St. Andrew Street Contract then "[l]iquidated [d]amages in the amount of *$4,735.50* plus . . . a container removal fee" would be assessed against Hotard Properties. The November St. Andrew Street Letter detailed the damages allegedly owed in the following manner:

Current Rate x 41 months = $4,735.00
Container Removal Fee $150.00 per [container] = $150.00
**TOTAL . . . AMOUNT DUE TO IV Waste LLC = $9,885.50**

Similarly, the November Rye Street Letter explained that, as of the date of the letter, the Rye Street Contract had 47 months remaining until its expiration. The November Rye Street Letter stated that if Hotard Properties continued in its efforts to cancel the Rye Street Contract then "[l]iquidated [d]amages in the amount of *$4,027.50* plus . . . a container removal fee" would be assessed against Hotard Properties. The November Rye Street Letter detailed the damages allegedly owed in the following manner:

Current Rate x 41 Months[3] = $3,877.50
Container Removal Fee $150.00 per [container] = $150.00
**TOTAL . . . AMOUNT DUE TO IV Waste LLC = $4,027.50**

The November Letters ended by stating that if IV Waste did not hear from Hotard Properties or receive payment of the above-detailed damages within ten days, IV

---

[3] Though the body of the November Rye Street Letter stated that the Rye Street Contract had 47 months remaining, the section that calculated the amount allegedly due to IV Waste stated that the Rye Street Contract had 41 months remaining.

Waste would assume that Hotard Properties had decided to continue to honor the Contracts.

### *January Letter*

IV Waste also attached to its Petition, a letter dated January 31, 2020 ("January Letter"), and sent by then-counsel for IV Waste to counsel for Hotard Properties, which was titled "Notice of Cancellation of Contracts."[4] The January Letter stated that it was "to serve as formal notice that [Hotard Properties] [was] in breach of the . . . [C]ontracts and" that "due to [Hotard Properties'] breach, said [C]ontracts [were] . . . cancelled." Additionally, the January Letter quoted the Access and Default Provisions from the Contracts, contending that the lack of proper access to the containers constituted a breach of the Contracts. The January Letter demanded liquidated damages (and detailed the amount allegedly owed) and instructed Hotard Properties to notify IV Waste by February 7, 2020, if it was willing to pay the liquidated damages.

### *February Letter*

IV Waste attached another letter as an exhibit to its Petition. This letter, which was dated February 12, 2020 ("February Letter"), reiterated that IV Waste's containers were "being placed in improper areas not in accordance with [the] Contract[s]." The February Letter also stated that IV Waste had not received a response to the January Letter and that "[r]egardless of the parties' positions concerning the breach of the . . . [C]ontracts, the parties appear to agree that the contracts have been cancelled." In closing, the February Letter explained that IV Waste intended to pick up its containers from the St. Andrew Street and Rye Street

---

[4] We note that the attorney who sent the January Letter on behalf of IV Waste is not the same attorney representing IV Waste in this appeal.

Properties and that Hotard Properties' failure to respond by the close of business that same day would confirm that Hotard Properties did not object to IV Waste picking up the containers.

## Answer

On December 3, 2020, Hotard Properties filed its Answer to IV Waste's Petition, wherein Hotard Properties alleged that IV Waste was actually the party who had breached the Contracts by failing to perform the services contracted for; by picking up its equipment; by cancelling the Contracts; and by driving its trucks on the properties in violation of the Contracts. In fact, Hotard Properties asserted that IV Waste owed money for the damage done to the St. Andrew Street and Rye Street Properties by IV Waste driving its trucks on the properties in violation of the Contracts. Further, Hotard Properties contended in its Answer that Hotard Properties had paid all amounts that were due to IV Waste under the Contracts.

## Trial

On May 31, 2023, this matter proceeded to trial. IV Waste provided testimony from Julie Tufaro ("Ms. Tufaro"); and Jim Hotard ("Mr. Hotard") testified on behalf of Hotard Properties. The trial centered on whether Hotard Properties breached the Contracts as alleged by IV Waste and, if so, whether IV Waste was entitled to damages, as well as attorney fees.

### Testimony of Ms. Julie Tufaro

Ms. Tufaro testified that as general manager of IV Waste, she reported to IV Waste's owner, Sidney Torres, IV ("Mr. Torres IV"), and that her duties included overseeing operations, managing customers with concerns or issues, and hiring and firing staff. Ms. Tufaro stated that IV Waste's standard contracts were for five years with a five-year renewal option, which was the standard in the waste

7

collection business. When asked further why IV Waste's standard contracts were for five years in duration, Ms. Tufaro explained that this timeframe allowed IV Waste to recoup its investment in the container provided to the customer. As to IV Waste's standard procedures for cancelling a contract, Ms. Tufaro testified, that when a customer wished to cancel, the procedure under the contract was for the customer to send a cancellation letter via certified mail at least 90 days prior to the contract's expiration. When asked whether anyone at IV Waste had the authority to release a party from their contract early, Ms. Tufaro responded that only she and Mr. Torres IV had the authority to do so.

Turning to the details of the Contracts at issue in this matter, counsel for IV Waste showed photocopies of the Contracts to Ms. Tufaro. When asked if she knew what happened to the original Contracts, Ms. Tufaro responded, "I do not," noting that the original Contracts had been signed five years prior. Nonetheless, Ms. Tufaro discussed the Contracts, explaining that IV Waste and Hotard Properties entered into the five-year Contracts to service waste containers at the St. Andrew Street and Rye Street Properties, with the St. Andrew Street Contract commencing in April 2018 and the Rye Street Contract commencing in October 2018. She further explained that the St. Andrew Street Contract was for a 4-yard container with service once per week and the Rye Street Contract was for a 2-yard container with service two times per week. The trial court admitted the photocopies of the Contracts into evidence.

Ms. Tufaro also read the Default Provision of the Contracts aloud during her testimony. When asked about "improper access" at the St. Andrew Street and Rye Street Properties, Ms. Tufaro testified that IV Waste "went to service the containers on a normal service day and the containers [were not] there for the

8

drivers to pick up and" that the driver "reported to the office that [the container]s were not in their original location." Ms. Tufaro explained that she did not personally visit the St. Andrew Street and Rye Street Properties on the same date the drivers first reported the containers missing; but she explained that the driver took a timestamped photograph of the location of the missing container on each property. Further, when asked the specific day the containers were missing, Ms. Tufaro testified that the drivers went "multiple times" only to find that the containers were missing. Ms. Tufaro stated that, at some point after the drivers reported the containers missing, she visited the St. Andrew Street and Rye Street Properties, at which point she also took photographs showing that the containers were missing. However, Ms. Tufaro explained that she did not have either the photographs that she had taken or the photographs that the drivers had taken with her at the trial. Discussing Rye Street in particular, Ms. Tufaro testified that when she visited the property, there was a blue container in the location where IV Waste's container should have been. Upon being asked when IV Waste picked up the containers, Ms. Tufaro responded, "We did not pick up our [containers]. They disappeared."

Ms. Tufaro also testified about the November Letters, explaining that she authored them and had already been in communication with Mr. Hotard about the missing containers at the time she wrote the letters. Ms. Tufaro stated that the November Letters were designed to "tak[e] the proper steps to . . . remind [Hotard Properties of] the contract terms." Additionally, Ms. Tufaro explained that she calculated the damages listed in the November Letters by using the number of months remaining on the contract and adding in a container removal fee.

Further, Ms. Tufaro testified about a meeting that she arranged between Mr. Hotard and Sidney Torres V ("Mr. Torres V") at another property located at Deer Field Road ("Deer Field Road Property")[5] to discuss resolution of issues with the pickup service there. Ms. Tufaro stated that she was present at the Deer Field Road Property meeting, at which "[t]he final outcome was that IV Waste let Mr. Hotard out of the Deer Field [Property] contract because there was no solution [Mr. Hotard] would accept." However, Ms. Tufaro clarified that at no time did IV Waste agree to cancel the St. Andrew Street Contract and the Rye Street Contract.

### Testimony of Mr. Jim Hotard

Mr. Hotard identified himself as the sole member of Hotard Properties. Regarding the Rye Street Property, Mr. Hotard stated the container was located in the front in a corral (fenced area) with a gate and was approximately 15 yards from the street. Mr. Hotard explained that the container for the St. Andrew Street Property was located in the back of the property; but, pursuant to the St. Andrew Street Contract, Mr. Hotard stated that IV Waste was not permitted to drive onto the property to access the container, and, instead, the container had to be wheeled to the street for IV Waste to be able to access it. To this end, Mr. Hotard stated that the container had always been wheeled to the street as required by the St. Andrew Street Contract. Mr. Hotard testified that during the duration of the time IV Waste serviced the St. Andrew Street Property and the Rye Street Property, nothing changed in terms of where the containers were placed. He stated that nothing interfered with IV Waste's access to the containers and that Hotard Properties never breached the Contracts.

---

[5] The Deer Field Road Property is not at issue in this appeal.

Mr. Hotard also answered in the negative when asked whether he ever cancelled the St. Andrew Street and Rye Street Contracts. Instead, he contended that IV Waste cancelled the contracts during and following the meeting at the Deer Field Road Property. Thereafter, the following colloquy occurred:

> Q    How did it come about that [IV Waste] cancel[l]ed the contracts- -these . . . contracts that we are talking about?
>
> A    I know Sidney Torres[6] was there and [I am] not sure if it was Julie Tufaro or Julie Ricks.[7] I apologize. I just [do not] remember. But my conversation was mostly with Sidney Torres. He was [a] very nice gentleman, and he said that the wheels are coming off of the [containers] and that I needed to start paying for them because [IV Waste] already repaired them twice and [was] not going to do that anymore. And I said, I [do not] want to pay for the wheels. You need to put a more aggressive wheel[,] a bigger wheel or suggested maybe using a metal plate and they slide down the curbs to load the truck, and he said that they are going to cancel the contracts. And I said no, I have a contract. I [do not] want to cancel the contracts. He said, no, we are going to pick up our [containers]. And we were texting back and forth after that when he said pick up the [containers] . . . .
>
>     I said, well, I have to go find another company. This is not going to be easy. And he said, [w]ell, [I will] give you more time.
>
>     . . . .
>
> Q    But IV Waste came and picked up the [containers]?
>
> A    Yes, they were gone.

Counsel for Hotard Properties then asked Mr. Hotard whether he had moved the containers (as opposed to IV Waste picking them up), and Mr. Hotard responded that he had not moved the containers.

---

[6] In his testimony, Mr. Hotard did not specify if this was Mr. Torres IV or Mr. Torres V; but, based on Ms. Tufaro's testimony, Mr. Torres V was the one present at the Deer Field Road Property meeting.

[7] Ms. Julie Ricks is not identified in the record. Again, however, based on Ms. Tufaro's testimony, she was the one present at the Deer Field Road Property, not Julie Ricks.

Counsel for Hotard Properties showed Mr. Hotard an exhibit, which was a screenshot photograph of an October 1, 2019 text message conversation between Mr. Hotard and Mr. Torres V ("October Text Conversation"). Mr. Hotard read aloud a text message he received during the October Text Conversation as follows: "Jim, we are terminating the [contract][.] [W]e are going to pick up the [containers]. [I]f we can help you with anything further, please let me know. Thank you." Mr. Hotard testified that he then sent a "thumbs up," in response, to which Mr. Torres V asked, "Does that mean we can take [the containers]?" Mr. Hotard explained that he again sent a "thumbs up" in response. When asked whether the October Text Conversation pertained to all of Hotard Properties' contracts with IV Waste (i.e., the St. Andrew Street Contract, the Rye Street Contract, and the Deer Field Road Contract), Mr. Hotard responded in the affirmative. Mr. Hotard testified that, as he understood it, IV Waste cancelled the St. Andrew Street Contract, the Rye Street Contract, and the Deer Field Road Contract in the October Text Conversation. On cross-examination, counsel for IV Waste asked Mr. Hotard about the fact that the text message used the word "contract" (i.e., singular), and counsel for IV Waste stated, "[That is] referring to one contract. Is that what it says?" Mr. Hotard responded, "[I am] not sure what [it is] referring to [sic]."

### *July 12, 2023 Judgment*

The trial court signed a judgment on July 13, 2023, which stated, in pertinent part:

> After reviewing the record, evidence presented at trial, post-trial memoranda, and the applicable law, this court finds the following[:]
>
> . . . .
>
> That the plaintiff has met its burden of proof with regard to [the St. Andrew Street and Rye Street Properties][.] The court finds that

defendant Jim Hotard Properties, LLC[,] is liable for breach of contract[.]

    **IT IS HEREBY ORDERED** that Jim Hotard Properties, LLC[,] is liable to plaintiff IV Waste in the amount of $13,913 in lost profits, and consequential damages[.] [Jim Hotard Properties] must also pay reasonable attorney[] fees[.]

    . . . .

    **IT IS FURTHER ORDERED** that a hearing is set for August 17, 2023[,] at 9[:]30 [a.m.] to determine the amount of reasonable attorney[] fees to be awarded to the plaintiff[.[8]]

    **IT IS FURTHER ORDERED** this is the final judgment of the Court[.]

Thereafter, Hotard Properties timely filed its appeal with this Court.

## ASSIGNMENTS OF ERROR

On appeal, Hotard Properties assigns four errors to the trial court's July 12, 2023 judgment. Specifically, Hotard Properties contends:

1. The trial court erred in admitting photocopies of the service contracts rather than requiring [IV Waste] to produce the original contracts.

2. The trial court erred in finding that [IV Waste] had met its burden of proof as to breach of contract.

3. The trial court erred in awarding [IV Waste] liquidated damages when the contracts did not provide for liquidated damages and when [IV Waste] did not meet its burden of proof as to damages.

4. The trial court erred in finding [Hotard Properties] liable for damages after the contract had been cancelled by [IV Waste].

Before turning to the merits of these assignments of error, we address a preliminary matter.

---

[8] As will be discussed later in this Opinion, the record reveals that the trial court ultimately cancelled the August 17, 2023 hearing upon Hotard Properties filing the instant appeal.

## PRELIMINARY MATTER/JURISDICTION

### Attorney Fees Awarded but Not Set in Judgment

"Before addressing the merits of an appeal, appellate courts have a duty to determine *sua sponte* whether a valid, final judgment properly invoked their appellate jurisdiction." *LZM Props., LLC v. Priv. Connection Prop., Inc.*, 2023-0707, 0708, p. 12 (La. App. 4 Cir. 4/25/24), ___ So.3d ___, ___, 2024 WL 1793245, at *6 (citing *Safford v. New Orleans Fire Dep't*, 2023-0495, p. 18 (La. App. 4 Cir. 2/1/24), 384 So.3d 909, 925-26). The July 12, 2023 judgment ordered Hotard Properties to pay reasonable attorney fees to IV Waste, but the judgment did not specify the amount of those fees. Instead, the judgment set a hearing for August 17, 2023, to determine the amount of reasonable attorney fees. Upon Hotard Properties filing this appeal, however, the trial court postponed the hearing on attorney fees without date. As such, the trial court has not yet determined the attorney fees in this case.

Louisiana Code of Civil Procedure Article 2088 is titled "Divesting of jurisdiction of trial court." It states, in relevant part:

> A. The jurisdiction of the trial court over all matters in the case reviewable under the appeal is divested, and that of the appellate court attaches, on the granting of the order of appeal and the timely filing of the appeal bond, in the case of a suspensive appeal or on the granting of the order of appeal, in the case of a devolutive appeal. Thereafter, the trial court has jurisdiction in the case only over those matters not reviewable under the appeal, including the right to do any of the following:
>
> . . . .
>
> (10) Set and tax costs, expert witness fees, and attorney fees.

La. C.C.P. art. 2088(A)(10).

14

As this Court recently explained, "[i]n 2021, the Louisiana Legislature amended La. C.C.P. art. 2088(A)(10) to 'clarif[y] that the trial court retains jurisdiction for purposes of setting attorney fees after an appeal has been taken from the initial judgment.'" *LZM Props., LLC*, 2023-0707, 0708, p. 13, ___ So.3d at ___, 2024 WL 1793245, at *6 (second alteration in original) (quoting La. C.C.P. art. 2088(A)(1), Comments 2021, comment (a)). The reason the Louisiana Legislature so amended La. C.C.P. art. 2088(A)(10) "is because '[t]rial courts award reasonable attorney fees in many judgments, but often these judgments are appealed before the attorney fees are set.'" *Id.* (alteration in original). With the 2021 amendment, however, "it is no longer necessary for an appellate court to dismiss an appeal in order to allow the trial court to set the amount of the attorney fees, because the trial court has jurisdiction to set attorney fees while the appeal is pending." *Id.* (finding that this Court's jurisdiction was not affected when the judgment awarded attorney fees but did not set the amount of the fees). *See also Raymond v. Lasserre*, 2022-0793, p. 13 (La. App. 1 Cir. 3/6/23), 368 So.3d 82, 93 (holding that the trial court did not have jurisdiction to grant the plaintiff's request to set attorney fees incurred at the trial court and that "this request is more properly directed to the trial court" because the trial court retained jurisdiction while the appeal was pending to set attorney fees); *Benoist v. Jackson Nat'l Life Ins. Co.*, 2022-0879, p. 4 (La. App. 1 Cir. 3/1/23), 362 So.3d 957, 961 (holding that "the judgment awarding attorney fees and costs in an indefinite amount did not divest the trial court of jurisdiction to determine, after a hearing and consideration of evidence, the actual amount to be awarded as attorney fees and costs" per La. C.C.P. art. 2088(A)(10)); *Locke v. MADCON Corp.*, 2022-0630, pp. 5-6 (La. App. 1 Cir. 12/22/22), 360 So.3d 519, 523 (finding the subject judgment "to be precise,

15

definite, and certain for purposes of constituting a valid, final judgment on appeal" even though the trial court left to be determined the costs of the proceeding because the trial court retained jurisdiction pursuant to La. C.C.P. art. 2088(A)(10) (citing *Advanced Leveling & Concrete Sols. v. Lathan Co.*, 2017-1250, p. 4 (La. App. 1 Cir. 12/20/18), 268 So.3d 1044, 1046)).

In *Raymond*, the Louisiana First Circuit Court of Appeal specifically noted that "the present version of [La.] C.C.P. art. 2088(A)(10) . . . requires the appellate court to treat a judgment as final even though it awards attorney fees but fails to set the amount of attorney fees." 2022-0793, p. 14, 368 So.3d at 93 n.6. Accordingly, the fact that the trial court's July 12, 2023 judgment did not set the amount of attorney fees to be awarded to IV Waste does not affect this Court's jurisdiction. As amended, La. C.C.P. art. 2088(A)(10) requires us to treat this as final judgment even though it awarded attorney fees but failed to set the amount of those fees. Having determined that a valid, final judgment properly invoked our appellate jurisdiction, we next turn to the standards of review applicable in this matter.

## STANDARDS OF REVIEW

Hotard Properties, by its assignments of error, presents multiple issues which require different standards of review. For ease of discussion and the flow of this Opinion, we address the applicable standards of review in this part of the Opinion prior to our analysis of the issues.

In its first assignment of error, Hotard Properties argues the trial court erred in admitting into evidence the photocopied duplicates of the contracts. As to the admission or exclusion of evidence, this Court has previously explained that "[a] trial court is afforded great discretion concerning the admission of evidence" at trial, "and its decision to admit or exclude evidence may not be reversed on appeal

16

in the absence of abuse of that discretion." *Robert v. State through Governor Div. of Admin.*, 2023-0397, p. 17 (La. App. 4 Cir. 12/6/23), 381 So.3d 715, 729-30 (quoting *Alfred Conhagen, Inc. of La. v. Ruhrpumpen, Inc.*, 2021-0396, 0397, p. 5 (La. App. 4 Cir. 4/13/22), 338 So.3d 55, 62). Further, the abuse of discretion standard of review for the admissibility of evidence has been explained by this Court in *Youngblood v. Hampton* as follows:

> The abuse of discretion standard is highly deferential to the trial court unless the court exercised its discretion based upon an erroneous view of the law or a clearly erroneous view of the facts. *Tran v. Collins*, [20]20-0246, p. 5 (La. App. 4 Cir. 8/20/21), 326 So.3d 1274, 1279 (citing *Show & Tell of New Orleans, L.L.C. v. Fellowship Missionary Baptist Church*, [20]14-0843, p. 2 (La. App. 4 Cir. 12/17/14), 156 So.3d 1234, 1237). If an appellate court finds the trial court erred in its decision to admit or exclude evidence, the appellate court must evaluate whether the errors, cumulatively, are prejudicial to the extent they constitute reversible error. *Lovecchio v. Romain*, [20]19-0779, [0864, 0865,] p. 11 (La. App. 3 Cir. 3/25/20), 364 So.3d 202, 211.

2022-0202, pp. 9-10 (La. App. 4 Cir. 12/9/22), 367 So.3d 676, 684.

In its second assignment of error, Hotard Properties contends that the trial court erred in finding that IV Waste met its burden of proving breach of contract. Hotard Properties' third and fourth assignments of error also relate to the trial court's finding that IV Waste met its burden of proving that Hotard Properties breached their Contracts. In discussing the standard of review concerning a trial court's finding of breach of contract, this Court has previously held that "[a] trier of fact's factual conclusions respecting a breach of contract claim are governed by the manifest error or clearly wrong standard of review." *Brenner v. Zaleski*, 2014-1323, p. 3 (La. App. 4 Cir. 6/3/15), 174 So.3d 76, 79 (citing *Tarifa v. Riess*, 2002-1179, p. 10 (La. App. 4 Cir. 5/7/03), 856 So.2d 21, 27). *See also Wolfe v. Hamdan*, 2014-0974, p. 4 (La. App. 4 Cir. 6/24/15), 171 So.3d 1154, 1157. This Court has established that, under the manifest error or clearly wrong standard of review,

17

"[w]here there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." *Ratliff v. LSU Bd. of Supervisors*, 2009-0012, 0013, 0014, p. 6 (La. App. 4 Cir. 5/7/10), 38 So.3d 1068, 1074 (citing *Foley v. Entergy La., Inc.*, 2006-0983, p. 10 (La. 11/29/06), 946 So.2d 144, 153). *See also Inter City Express, Inc. v. Mallory Grp., Inc.*, 2006-1340 (La. App. 4 Cir. 5/16/07), 2007 WL 7711153, at *2 (holding that "reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed" when there is a conflict in the testimony (citing *Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989))). However, this Court has held that "if the trial court makes a legal error that interdicts the fact-finding process, the appellate court must conduct a *de novo* review of the record." *1100 S. Jefferson Davis Parkway, LLC v. Williams*, 2014-1326, p. 3, 165 So.3d 1211, 1215 (citing *Dejoie v. Guidry*, 2010-1542, p. 14 (La. App. 4 Cir. 7/13/11), 71 So.3d 1111, 1120).

With these standards of review in mind, we next turn to discussion of the issues.

**DISCUSSION**

**Assignment of Error Number One: Admissibility of the Photocopies of the Contracts**

As stated previously, in its first assignment of error, Hotard Properties asserts that the trial court erred in admitting into evidence the photocopied duplicates of the Contracts. Hotard Properties contends that the duplicates are illegible and that without the original Contracts, there was no way for the trial court to determine what Hotard Properties' obligations were and what constituted a

breach of those obligations under the Contracts. Accordingly, Hotard Properties contends that the trial court should have dismissed IV Waste's Petition due to IV Waste's failure to produce the original Contracts because the Contracts were the basis of IV Waste's claims in its Petition. As previously discussed under the Standards of Review section of this Opinion, this Court will not reverse the trial court's evidentiary determination absent a finding of abuse of discretion.

"[A]n original document is generally required to prove the content[s] of a writing." *Miss Bee's Snoworld, LLC v. Guidry*, 2020-0946, p. 11 (La. App. 1 Cir. 6/18/21), 328 So.3d 477, 484 (citing La. C.E. art. 1002). That is, under La. C.E. art. 1002, "[t]o prove the content[s] of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided by [the Code of Evidence] or other legislation." Commonly referred to as the "best evidence" rule, La. C.E. art. 1002 "is to be applied sensibly and with reason." *State v. Vice*, 2022-512, p. 9 (La. App. 3 Cir. 4/19/23), 365 So.3d 155, 162 (quoting *State v. Jackson*, 30,473, pp. 13-14 (La. App. 2 Cir. 5/13/98), 714 So.2d 87, 95-96). *See also State in Interest of K.B.*, 2023-0409, p. 28 (La. App. 4 Cir. 9/26/23), 372 So.3d 864, 883 (referring to La. C.E. art. 1002 as the best evidence rule) (quoting *State v. Mattire*, 2011-2390 (La. App. 1 Cir. 9/21/12), 2012 WL 4335432, at *9). If the original is unavailable, then copies are admissible under certain circumstances. To this end, La. C.E. art. 1003 provides:

> A duplicate is admissible to the same extent as an original unless:
>
> (1) A genuine question is raised as to the authenticity of the original;
>
> (2) In the circumstances it would be unfair to admit the duplicate in lieu of the original; or

(3) The original is a testament offered for probate, a contract on which the claim or defense is based, or is otherwise closely related to a controlling issue.

As La. C.E. art. 1003(3) states, a duplicate is not admissible to the same extent as an original if it pertains to "a contract on which the claim or defense is based."

In interpreting La. C.E. art. 1003(3), however, the Louisiana Supreme Court has explained that even "[w]hen a duplicate is inadmissible under [La. C.E. art. 1003], it may nevertheless be admissible under [La. C.E. art.] 1004." *In re Succession of Morgan*, 2022-01763, p. 4, 370 So.3d 399, 402 (quoting La. C.E. art. 1003, comment (a)). This is because La. C.E. art. 1004 "sets out the exceptions to the general rule that the original writing is required to prove the contents of a writing," i.e., La. C.E. art. 1003. *Chauvin v. Jefferson Par. Sch. Bd.*, 595 So.2d 728, 730 (La. App. 5th Cir. 1992). Louisiana Code of Evidence Article 1004 provides, in pertinent part:

The original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if:

**(1) Originals lost or destroyed.** All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith;

**(2) Original not obtainable.** No original can be obtained by any available judicial process or procedure;

. . . .

**(5) Impracticality of producing original.** The original, because of its location, permanent fixture, or otherwise, cannot as a practical matter be produced in court; or the cost or other consideration to be incurred in securing the original is prohibitive and it appears that a copy will serve the evidentiary purpose.

For its admission into evidence, the proponent of a duplicate must first establish an excuse for non-production of the original under La. C.E. art. 1004, e.g., if the original has been lost or destroyed. *In re Succession of Morgan*, 2022-

01763, p. 4, 370 So.3d at 402 (citing La. C.E. art. 1003, comment (b)); La. C.E. art. 1004(1). Thus, according to the Louisiana Supreme Court, "an excuse for non-production of an original under La. C.E. art. 1004 . . . enables a proponent of a lost or destroyed [original] to rely on a duplicate which would otherwise be prohibited under La. C.E. art. 1003(3)." *In re Succession of Morgan*, 2022-01763, pp. 4-5, 370 So.3d at 402.[9] In interpreting La. C.E. arts. 1003 and 1004, Louisiana courts have concluded in contract cases that "the original is not required and other evidence of the contents of a writing, recording, or photograph is admissible if all originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith." *Miss Bee's Snoworld, LLC*, 2020-0946, p. 11, 328 So.3d at 484 (citing *Evans v. Graves Pontiac-Buick-GMC Truck, Inc.*, 576 So.2d 1025, 1027-28 (La. App. 1st Cir. 1991)). Therefore, if a "trial court [finds] that the original contract was lost, stolen, or destroyed (for which finding there is factual support), parol[] evidence [i]s permissible to prove its . . . contents." *Id.* (citing *In re Succession of Etienne*, 2012-1120, p. 5 (La. App. 4 Cir. 6/5/13), 118 So.3d 1224, 1226).

Here, Hotard Properties challenges the admissibility of the photocopies of the contracts, asserting that the fine print is illegible and that even Ms. Tufaro was unable to make out words when asked to read from the Contracts during her

---

[9] We note that in *In re Succession of Morgan*, the Louisiana Supreme Court considered the trial court's decision to admit into evidence an unsigned copy of a lost notarial testament. Though that case concerned a testament rather than a contract as in the matter *sub judice*, we find the Louisiana Supreme Court's analysis applicable. Louisiana Code of Evidence Article 1003(3) lists both testaments and contracts as circumstances in which a duplicate is not admissible to the same extent as the original. Nonetheless, the Louisiana Supreme Court explained that La. C.E. art. 1004 provides an avenue by which a proponent of a lost or destroyed testament can rely on a duplicate which would otherwise be prohibited under La. C.E. art. 1003(3).

testimony at trial. To this end, Hotard Properties contends that "[w]ithout the original, there is simply no way to prove the contents of the contract." However, we disagree that there was no way to prove the contents of these Contracts without the originals. In fact, Ms. Tufaro testified as to certain aspects of the contents of the Contracts. In particular, she stated that IV Waste's standard service agreement is for five-years with a five-year renewal option. When counsel for IV Waste showed Ms. Tufaro a copy of the Rye Street Contract, she identified it as IV Waste's standard service agreement but specified that it pertained to the Rye Street Property and listed the container size and pick-up frequency for that property. Then, when counsel for IV Waste showed Ms. Tufaro a copy of the St. Andrew Street Contract, she identified it as IV Waste's standard service agreement but specified that it pertained to the St. Andrew Street Property and listed the container size and pick-up frequency for that property. Further, Ms. Tufaro read aloud the Default Provision from one of the Contracts, and, according to her testimony, it stated, in pertinent part, that the customer would be in default if the customer failed to perform any obligations delineated in the contract. Regarding the originals of the Rye Street and St. Andrew Street Contracts, Ms. Tufaro stated that she did not know what happened to them, noting that the Contracts were years old (five years old by the time of trial).

Moreover, we disagree with Hotard Properties' contention that the photocopies are entirely illegible: in particular, this Court can ascertain the important aspects of the Access, Default, and Term Provisions of the Contracts, all of which are relevant to whether a breach of contract occurred in this matter and whether IV Waste proved its damages (as will be more fully discussed throughout this Opinion). Based on Ms. Tufaro's testimony that she was unaware what

happened to the original contracts (i.e., that they were lost) and our determination that the relevant portions of the photocopies of the Contracts are legible anyway, we conclude that the trial court did not abuse its discretion in permitting IV Waste to introduce the photocopies of the Contracts into evidence per La. C.E. art. 1004.

**Assignment of Error Number Two: Breach of Contract**

In its second assignment of error, Hotard Properties asserts that "[t]he trial court erred in finding that [IV Waste] met its burden of proof as to breach of contract." Specifically, Hotard Properties contends that although IV Waste's Petition alleged breach of contract on the basis of lack of proper access, "at the trial on the merits, not a single piece of evidence was introduced by IV Waste on the issue of improper access." Hotard Properties asserts that the only information about an alleged breach came from Ms. Tufaro's testimony, yet IV Waste "had no corroborating evidence to support [her] testimony," such as records, and did not "provide dates when this alleged breach occurred." Further, Hotard Properties reiterates its argument that "[t]he photocopies of the contracts introduced are unreadable so that it is impossible to determine from the contracts what the obligations of each party was." Hotard Properties counters that Mr. Hotard's testimony established that Hotard Properties did not remove IV Waste's containers in breach of the Contracts and that IV Waste actually removed its own containers.

As previously discussed in this Opinion, in breach of contract cases, "an appellate court may not set aside a trial court's findings of fact in the absence of manifest error or unless it is clearly wrong." *1100 S. Jefferson Davis Parkway, LLC*, 2014-1326, p. 3, 165 So.3d at 1215 (citing *Howard v. La. Citizens Prop. Ins. Corp.*, 2010-1302, p. 3 (La. App. 4 Cir. 4/27/11), 65 So.3d 697, 699). This Court has previously held that "[t]he 'elements of a breach of contract claim are the

existence of a contract, the party's breach thereof, and resulting damages.'" *Thomas v. Housing La. Now, L.L.C.*, 2023-0296, p. 5 (La. App. 4 Cir. 3/21/24), ___ So.3d ___, ___, 2024 WL 1208366, at *3 (quoting *Payphone Connection Plus, Inc. v. Wagners Chef, LLC*, 2019-0181, p. 8 (La. App. 4 Cir. 7/31/19), 276 So.3d 589, 595). The burden of proof for establishing a breach of contract is on the party making the claim for the breach and for damages. *See Fleet Intermodal Servs., LLC v. St. Bernard Port, Harbor & Terminal Dist.,* 2010-1485, p. 4 (La. App. 4 Cir. 2/23/11), 60 So.3d 85, 88 (citing *Rebouche v. Harvey*, 2000-2327, p. 3 (La. App. 4 Cir. 12/19/01), 805 So.2d 332, 334).

### *Existence of a Contract*

Regarding the first element of a breach of contract claim, the existence of a contract, neither Hotard Properties nor IV Waste dispute that Contracts existed between them for the Rye Street and St. Andrew Street Properties. The parties did not dispute the existence of the Contracts for both properties before the trial court nor do they do so before this Court. Accordingly, we move onto the breach element.

### *Breach*

Turning to the second element, breach, this Court has also described this element as "the obligor failed to perform the obligation" that the parties established in the contract. *Favrot v. Favrot*, 2010-0986, p. 14 (La. App. 4 Cir. 2/9/11), 68 So.3d 1099, 1109 (first citing *1436 Jackson Joint Venture v. World Constr. Co.*, 499 So.2d 426, 427 (La. App. 4th Cir. 1986); and then citing *Hercules Machinery Corp. v. McElwee Bros., Inc.*, 2002 WL 31015598, at *9 (E.D. La. 9/2/02)). We begin our discussion of this element by distinguishing *Sanga v. Perdomo*, 2014-609 (La. App. 5 Cir. 12/30/14), 167 So.3d 818, a case cited by Hotard Properties in

24

its brief to this Court in support of its assertion that IV Waste did not produce evidence of lack of proper access. Hotard Properties contends that in *Sanga*, the Louisiana Fifth Circuit Court of Appeal "found that the plaintiff did not carry her burden of proof in a contract case when she did not admit any evidence to support her allegations beyond her own testimony." In *Sanga*, after the defendant failed to replace her roof as the parties had contracted for, Reine Pema Sanga ("Ms. Sanga") ultimately received her full deposit back but nonetheless proceeded with a claim for damages for breach of contract. In support of her claim, Ms. Sanga merely offered her own testimony, in which she contended that she had to borrow money to replace her roof until she received the full deposit back from the defendant; that her homeowner's insurance rate increased because she had not replaced her roof sooner; and that she had to spend more money on the roof replacement than what the defendant quoted. *Id.* at p. 8, 167 So.3d at 822. In concluding that the trial court had not manifestly erred in determining that Ms. Sanga failed to meet her burden of proof with regard to damages as to her breach of contract claim, the Fifth Circuit noted that Ms. Sanga admitted no evidence beyond her own testimony in order to prove her financial damages. *Id.* In particular, the Fifth Circuit further noted that Ms. Sanga had not even admitted into evidence the contracts at issue in the case and that "[g]enerally, the damages in breach of contract cases are governed by the four corners of the contract." *Id.* (citing *Corbello v. Iowa Prod.*, 2002-0826 (La. 02/25/03), 850 So.2d 686, 714).

We find *Sanga* distinguishable and, accordingly, find Hotard Properties' reliance on it for the breach element to be misguided. First, the discussion in *Sanga* centered on whether the trial court erred in failing to find the defendant liable for breach of contract due to the lack of corroborating evidence for the damages

element of breach of contract, not the breach element. Second, in *Sanga* the contracts were not in evidence; but, in the matter *sub judice*, we already determined in assignment of error number one that the trial court did not abuse its discretion in admitting IV Waste's photocopies of the contracts into evidence. Thus, unlike in *Sanga*, we have the Contracts to inform what obligations Hotard Properties had to perform (and to what damages IV Waste was entitled as will be more fully discussed throughout the Opinion). Having distinguished Sanga from the matter *sub judice*, we next turn to the Contracts to determine Hotard Properties' obligations and whether the record supports the trial court's finding that they were breached.

In the Access Provision, the Contracts provided that "Customer grants Contractor a right of access to its designated equipment location and warrants the sufficiency of such right of way over and between the public way and equipment location." Additionally the St. Andrew Street Contract contained the notation that "driver can <u>not</u> [sic] pull truck on the property, [container] must be wheeled to the street." The Default Provision of the Contracts stated that "Customer is in default if" Customer "fails to perform any obligation herein." Thus, both the Rye Street and St. Andrew Street Contracts specified that Hotard Properties, as the customer, had to ensure that IV Waste had access to the containers and that failure to provide access to the containers rendered Hotard Properties in default of the Contracts, i.e., such action constituted a breach of the Contracts. Next, we consider the evidence adduced at trial as to whether Hotard Properties breached the Contracts.

Ms. Tufaro testified that IV Waste's drivers reported IV Waste's containers were missing at the St. Andrew Street and Rye Street Properties on multiple occasions sometime before November 2019, i.e., before IV Waste sent the

26

November Letters. Ms. Tufaro explained that after the drivers informed her of the missing containers, she visited the Rye Street Property and St. Andrew Street Property; observed that the containers were missing; and took photographs of where the containers should have been. Ms. Tufaro testified that IV Waste was unable to perform its services pursuant to the Contracts because the containers were missing at the Rye Street and St. Andrew Street Properties. In contrast with Ms. Tufaro's testimony, Mr. Hotard testified that the containers were accessible and that he moved the St. Andrew Street Property container to the street for pick-up pursuant to the St. Andrew Street Contract.

Neither party produced additional evidence about the breach element, so the trial court's resolution hinged on the credibility of these witnesses. As previously noted, under the manifest error standard of review, the trial court's "reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review[;]" and "[w]here there are two permissible views of the evidence," the trial court's determination cannot be manifest error. *Ratliff*, 2009-0012, 0013, 0014, p. 6, 38 So.3d at 1074 (citations omitted); *Rosell v. ESCO*, 549 So.2d 840 at 844. Considering the language of the Contracts in the Access and Default Provisions, as well as Ms. Tufaro's testimony that the drivers reported the missing containers and that she herself observed the missing containers, one "permissible view of the evidence" was that Hotard Properties failed to fulfill its obligations under the Contracts to provide proper access and thus breached the Contracts. Thus, because this was a permissible view of the evidence, the trial court's finding that Hotard Properties breached the Contracts cannot be manifest error, and we will not disturb the credibility determinations that the trial court made in arriving at this conclusion. Thus, we find that the trial court did not manifestly err in finding that

IV Waste satisfied the breach element. We next turn to the third and final element, damages.

***Damages***

The final element that a plaintiff must prove in a breach of contract claim is damages. As this Court has explained, this element means that the obligor's "failure to perform resulted in damages to the obligee." *Favrot*, 2010-0986, pp. 14-15, 68 So.3d at 1109. *See also* La. C.C. art. 1993 (stating that "[a]n obligor is liable for the damages caused by his failure to perform a conventional obligation"). In discussing the damages element in breach of contract claims, the Louisiana First Circuit Court of Appeal has held that "[l]oss of profit is an item of damages recoverable for breach of contract." *Landry v. Bourque*, 460 So.2d 33, 34 (La. App. 1st Cir. 1984) (citation omitted). Additionally, as previously stated, "[g]enerally, the damages in breach of contract cases are governed by the four corners of the contract." *Sanga*, 2014-609, p. 7, 167 So.3d at 822.

Turning to the Contracts in this matter, the Default Provision stated that "Customer is responsible for the costs and expenses of its default, and Contractor's lost profits and consequential damages, including cost of collection and reasonable attorney[] fees." Thus, the Contracts established that in the event of a breach, Hotard Properties not only had to pay IV Waste's lost profits but also a container removal fee for each property. In support of the damages element, IV Waste offered the November Letters, wherein IV Waste determined its lost profits as a calculation of the monthly service charge multiplied by the number of months remaining on each of the Contracts as of that date. On top of that number, IV Waste added a container removal fee to arrive at its damages number for each property. IV Waste also offered Ms. Tufaro's testimony in support of the damages

element. At the start of her testimony, Ms. Tufaro explained that IV Waste's standard service agreements were for five years because that duration of time "helps [IV Waste] to recoup [its] investment for the container that [it] provide[s] to the customer." Ms. Tufaro testified that she authored the November Letters and determined that IV Waste had been damaged in the amount of lost profits ("broken down by the number of months remaining on the contract") plus the container removal fee. Ms. Tufaro specified the number of months remaining on the Rye Street and St. Andrew Street Contracts when Hotard Properties failed to provide proper access to the containers and IV Waste sent the November Letters to Hotard Properties. Considering the Contracts, the demand letters, and Ms. Tufaro's testimony we find the trial court did not manifestly err in finding that Hotard Properties' breach of the Contracts resulted in damages to IV Waste in the amount of profit IV Waste lost for the remainder of the Contracts' terms and in the cost incurred by IV Waste to pick up its containers.

Having found that the trial court did not manifestly err in finding that IV Waste proved the three elements of breach of contract, we conclude that Hotard Properties' second assignment of error is without merit.

### Assignment of Error Number Three: Damages

In its third assignment of error, Hotard Properties argues that "[t]he trial court erred in awarding [IV Waste] liquidated damages when the contracts did not provide for liquidated damages and when [IV Waste] did not meet its burden of proof as to damages." Regarding the first part of this assignment of error, Hotard Properties cites to *Amacker v. Wedding*, 363 So.2d 223 (La. App. 4th Cir. 1978) for the assertion that "[i]f [a] contract . . . does not provide for stipulated or liquidated damages, then the plaintiff has the burden of proving the amount of the

damages." To this end, Hotard Properties contends that "there is no provision in the [C]ontracts" in this matter "that provide [sic] for the stipulation of damages or for liquidated damages." Instead, according to Hotard Properties, "IV Waste's [C]ontracts . . . provide that in the event of a default, the customer is responsible for the costs and expenses of its default, and for lost profits and consequential damages." This leads to the second part of this assignment of error whereby Hotard Properties argues that IV Waste had the burden of proving its damages yet "did not present a shred of evidence to itemize its damages."

### *Stipulated (Liquidated) Damages*

We begin with Hotard Properties' contention that "there is no provision in the contracts" in this matter "that provide [sic] for the stipulation of damages or for liquidated damages." Louisiana Civil Code Article 2005 states that "[p]arties may stipulate the damages to be recovered in case of nonperformance, defective performance, or delay in performance of an obligation." The expression "stipulated damages" that stems from the language of La. C.C. art. 2005 "is similar to the common law 'liquidated damages.'" La. C.C. art. 2005, comment (b) (1984). *See also* Macy P. Spencer, *Buyers Beware: Understanding the Consequence of Intentionally Breaching a Real Estate Purchase Agreement in a Civil Law Breaching a Real Estate Purchase Agreement in a Civil Law Jurisdiction*, 83 LA. L. REVIEW 1431, 1469 n.329 (2023) (explaining that "[i]n common law, *liquidated damages* are synonymous with Louisiana's *stipulated damages*" (citing *Mahoney v. Tingley*, 529 P.2d 1068, 1069 (Wash. 1975)); *Bodin v. Butler*, No. 09-30025, 2009 WL 2240800, at *451 (U.S. 5th Cir. 2009) (explaining that use of the phrase "stipulated damages" or the phrase "liquidated damages" in a contract provision is unimportant because the substance of the provision is what determines whether it

is a stipulated or liquidated damages clause); *Lombardo v. Deshotel*, 1994-1172, p. 8 (La. 11/30/94), 647 So.2d 1086, 1091 (explaining that sometime after 1949 Louisiana courts began equating stipulated damages clauses with the common-law concept of liquidated damages). In the November Letters, IV Waste used the phrase liquidated damages, and Hotard Properties uses the phrase liquidated damages in its brief when arguing that the Contracts did not provide a liquidated damages clause; but, because Louisiana's stipulated damages are analogous to liquidated damages, we will consider whether the Contracts contained a *stipulated* damages provision.

As previously stated, La. C.C. art. 2005 establishes that parties to a contract can predetermine the damages that are recoverable in the case of nonperformance, defective performance, or delay in performance. To determine whether a contract provision provides for stipulated damages, courts should consider whether "[t]he substance of the clause is clear and unequivocal in its purpose to set a fixed amount of damages for breach of the agreement." *Bodin*, No. 09-30025, 2009 WL 2240800, at *451. As the Louisiana Supreme Court has explained, "the essential ingredients of a stipulation of damages" are that "it was stipulated in advance by the parties, provides the sum to be recovered in case of nonperformance, and gives rise to a secondary obligation for the purpose of enforcing the principal one." *Lombardo*, 1994-1172, p. 6, 647 So.2d at 1090 (citing La. C.C. art. 2005). The notion behind a stipulated damages clause is "to fix the measure of damages in advance and to help ease the burden of proving loss with certainty." *Henderson v. Ayo*, 2011-1605, pp. 7-8 (La. App. 4 Cir. 6/13/12), 96 So.3d 641, 646 (first citing *Heirs of Gremillion v. Rapides Par. Police Jury*, 493 So.2d 584, 587 (La. 09/08/86); and then citing *Philippi v. Viguerie*, 606 So.2d 577, 579 (La. App. 5 Cir.

31

09/29/92). Thus, a party seeking to enforce a stipulated damage clause need not "show[] . . . pecuniary or other actual damage . . . to enforce the clause." *Id.* With a stipulated damages clause, the parties either select an amount for the stipulated damages or a set method for determining the stipulated damages. *See, e.g., Grimsley v. Lenox*, 1993-1618, p. 5 (La. App. 3 Cir. 9/14/94), 643 So.2d 203, 206 (finding that the written agreement required the defendant to forfeit her $500 deposit to the plaintiffs in light of the stipulated damages clause); *White v. Strange*, 2011-523, pp. 6-7 (La. App. 3 Cir. 12/21/11), 80 So.3d 1189, 1193 (holding that "the trial court correctly applied the stipulated amount of damages listed in the buy and sell agreement," which provided for stipulated damages in the amount of 10% of the purchase price).

Turning to the Contracts, the only provision that concerns what will happen in the event of a default (or breach), the Default Provision, provided that Hotard Properties would be responsible for the costs and expenses of its default, as well as for lost profits and consequential damages. This is not a stipulated damages clause because it does not state the specific sum to be recovered or even a method for calculating the sum to be recovered in the event of a default (or breach). Thus, we agree with Hotard Properties that the Contracts in this matter did not contain a stipulated damages clause. Further, we agree with Hotard Properties that because the Contracts did not provide for stipulated damages, IV Waste had the burden of proving its actual damages. *See Henderson*, 2011-1605, p. 8, 96 So.3d at 646 (holding that the contract did not contain a stipulated damages provision, such that the plaintiff's recovery was limited to her actual damages, and then determining what the plaintiff proved in terms of her actual damages). Accordingly, we turn our

32

consideration to what IV Waste proved in terms of its actual damages as a result of Hotard Properties' breach of the Contracts.

***Proof of IV Waste's Damages***

In support of this part of assignment of error number three, Hotard Properties asserts that "IV Waste did not present a shred of evidence to itemize its Damages." Further, Hotard Properties argues that "[t]he amount of the monthly payment does not take into account the costs and expenses associated with the performance of the contract. Not all of the monthly payments constitutes profit."

According to La. C.C. art. 1995, "[d]amages are measured by the loss sustained by the obligee and the profit of which he has been deprived." Only if "damages are insusceptible of precise measurement" will "much discretion . . . be left to the court for the reasonable assessment of these damages." La. C.C. art. 1999. The party asserting a breach of contract claim bears "the burden of proving any damage suffered by it as a result of a breach of contract." *Payphone Connection Plus, Inc.*, 2019-0181, p. 13, 276 So.3d at 597 (quoting *L & A Contracting Co. v. Ram Indus. Coatings, Inc.*, 1999-0354, p. 20 (La. App. 1 Cir. 6/23/00), 762 So.2d 1223, 1235).

As previously stated, the damages in a breach of contract case are generally governed by the four corners of the contract; and the Contracts at issue herein stated that breach of the Contracts would render Hotard Properties liable for IV Waste's lost profits and consequential damages. This Court recently discussed the proof required in terms of lost profits in *Huntsman Int'l, L.L.C. v. Praxair, Inc.*:

> "As a general rule[,] 'damages for loss of profits may not be based on speculation and conjecture; however, such damages need be proven only within reasonable certainty.'" *PVCA, Inc. v. [Pac.] [W.] TD Fund LP*, [20]20-0327, p. 14 (La. App. 4 Cir. 1/20/21), 313 So.3d 320, 331 (quoting *Breton Sound Oyster Co.*, [20]17-0955, p. 14, 299

33

So.3d at 90). "Broad latitude is given in proving lost profits because this element of damages is often difficult to prove and mathematical certainty or precision is not required." *Id.* "The plaintiff bears the burden of proving entitlement to special damages by a preponderance of the evidence." *Cox, Cox, Filo, Camel & Wilson, LLC*, [20]21-00566, p. 11, 338 So.3d at 1157 (first citing *Breaux v. Woods*, [20]20-0161, p. 8 (La. App. 3 Cir. 11/18/20), 307 So.3d 395, 402; and then citing *Caruso v. Acad. Sports & Outdoors*, [20]18-0496, p. 7 (La. App. 5 Cir. 4/24/19), 271 So.3d 355, 362). "That is, the plaintiff must show that the loss of profits is more probable than not." *Breton Sound Oyster Co.*, [20]17-0955, p. 14, 299 So.3d at 90 (quoting *Wasco, Inc. v. Econ. Dev. Unit, Inc.*, 461 So.2d 1055, 1057 (La. App. 4th Cir. 1985)). Moreover, if the defendants do not refute the evidence offered by the plaintiffs to prove their special damages, and the record supports the plaintiffs' assertion, the district court does not err if it awards those damages. *See Cox Commc'ns v. Tommy Bowman Roofing, LLC*, [20]04-1666, p. 9 (La. App. 4 Cir. 3/15/06), 929 So.2d 161, 167.

2022-0777, p. 7 (La. App. 4 Cir. 4/19/24), ___ So.3d ___, ___, 2024 WL 1695071, at *3 (first alteration in original). Further, as the Louisiana First Circuit Court of Appeal has explained, "lost profits are calculated by deducting the expenses that would have been incurred if the parties had complied with the contract from the gross revenues that would have been derived from the contract." *First Alarm Fire Equip., Inc. v. Southland Int'l of La.*, 47,823, p. 7 (La. App. 2 Cir. 5/8/13), 114 So.3d 1168, 1172 (citing *Rosbottom v. Off. Lounge, Inc.*, 1994-894 (La. App. 3 Cir. 4/5/95), 654 So.2d 377). Though "[a] party's own detailed testimony as to his loss may be sufficient to support an award for loss of profits," typically "a claim for lost profits cannot rest solely on the testimony of the injured party without being substantiated by other evidence." *Id.* at pp. 7-8, 114 So.3d at 1172 (citing *Simpson v. Restructure Petroleum Mktg. Servs., Inc.*, 36,508 (La. App. 2 Cir. 10/23/02), 830 So.2d 480). If the plaintiff's evidence and/or testimony "lack[s] . . . even a minimal degree of detail or specificity as to the extent of loss," then this "precludes an

award." *Id.* (quoting *Jackson v. Lare*, 34,124, p. 8 (La. App. 2 Cir. 11/1/00), 779 So.2d 808, 814).

For example, in another breach of contract case, *Payphone Connection Plus, Inc.*, this Court considered the testimony of Suzanne Wimsatt ("Ms. Wimsatt"), who was alleged to be Payphone Connection Plus, Inc.'s ("Payphone") president and owner. 2019-0181, p. 3, 276 So.3d at 592. At the hearing held by the trial court, Ms. Wimsatt replied in the affirmative when asked "whether she prepared a 'calculation of the anticipated revenue' resulting from the alleged breach of contract," and she "indicated that the anticipated amount was '[\$]296,389.05,'" which was the amount of lost profits for which she sought judgment. *Id.* at pp. 13-14, 276 So.3d at 598 (alteration in original). Thereafter Payphone's counsel offered into evidence a document identified as "Calculation of Lost Revenue." *Id.* at p. 14, 276 So.3d at 598. However, counsel did not ask Ms. Wimsatt any specific questions regarding that document nor did Ms. Wimsatt provide an "explanation as to how she arrived at the sum . . . given" or give any "'degree of detail and specificity' as to the issue of lost profits." *Id.* This Court concluded that Payphone's attempts to prove its lost profit claim fell below the "minimal degree" required to support a lost profit claim, vacated the trial court's judgment, and remanded the matter. *Id.*

In terms of proving its lost profits, IV Waste offered the testimony of Ms. Tufaro, as well as the November Letters, both of which demonstrated that IV Waste determined its lost profits were a calculation of the number of months remaining on each of the Contracts multiplied by the monthly service charge specific to each contract. Hotard Properties asserts that by simply using the monthly payment under the Contracts, IV Waste's calculation method failed to

35

account for the costs and expenses associated with performance of its obligations under the Contracts and that not all of the monthly payments would have constituted profit. We agree with Hotard Properties and find Ms. Tufaro's testimony analogous to Ms. Wimsatt's testimony in *Payphone Connection Plus, Inc.* Though Ms. Tufaro testified that she calculated the lost profit number included in the November Letters by multiplying the number of months remaining on the contract by the monthly service charge, as in *Payphone Connection Plus, Inc.*, counsel for IV Waste did not elicit further testimony from Ms. Tufaro in terms of how she arrived at those lost profit numbers so as to provide sufficient detail and specificity that this was an accurate calculation of IV Waste's lost profits. In particular, IV Waste's calculation failed to deduct the expenses that would have been incurred if the parties had complied with the Contracts from the gross revenues that would have been derived from the Contracts. Even if all of Hotard Properties' monthly payments would have constituted profit for IV Waste, IV Waste offered no testimony or evidence in support of same. Though lost profits need not be proven with mathematical certainty or precision, IV Waste's failure to even reference costs and expenses in relation to gross revenue falls below the minimal degree required to support a lost profit claim.

Additionally, in terms of the container removal fee, IV Waste merely offered the November Letters without any evidence or testimony to support the amount asserted ($150) as the container removal fee. In fact, as previously noted, the box next to the one-time $100 removal fee on the Rye Street contract was not even selected. Thus, it is unclear why the Rye Street Contract provided for the option of including a $100 removal fee, yet IV Waste did not select this option. Even if IV Waste were to contend that this constitutes a consequential damage, it is unclear

36

why IV Waste asserted a removal fee of $150 upon Hotard Properties breaching the Contracts but IV Waste apparently had $100 as its removal fee in its standard service contracts at some point in time.

Moreover, we note that the lost profit calculations performed by IV Waste (and accepted by the trial court) are incorrect. In the body of the November Rye Street Letter, IV Waste stated that 47 months remained on the Rye Street Contract. However, in the section of the November Rye Street Letter detailing the damages allegedly owed, IV Waste multiplied the monthly service charge by 41 months. Based on the record, the number of months remaining on the Rye Street Contract appears to be 47: two for the year 2019 (November and December); twelve for the year 2020; twelve for the year 2021; twelve for the year 2022; and nine for the year 2023 (January through September before the Rye Street Contract expired on October 1, 2023). Regardless, the lost profit calculation done by IV Waste in the November Rye Street Letter does not appear to use 41 or 47 months remaining:

41 remaining months x $75 monthly fee = $3,075
47 remaining months x $75 monthly fee = $3,525

Yet, IV Waste arrived at a lost profit calculation of $3,877.50, without any explanation for this increased amount.

Similarly, the lost profit calculations performed by IV Waste (and accepted by the trial court) are incorrect for the St. Andrew Street Property too. In the body of the November St. Andrew Street Letter, IV Waste stated that 41 months remained on the St. Andrew Street Contract; and in the section of the November St. Andrew Street Letter detailing the damages allegedly owed, IV Waste multiplied the monthly service charge by 41 months. Based on the record, IV Waste correctly determined that 41 months remained on the St. Andrew Street

37

Contract: two for the year 2019 (November and December); twelve for the year 2020; twelve for the year 2021; twelve for the year 2022; and three for the year 2023 (January through March before the St. Andrew Street Contract expired on April 6, 2023). Regardless, the lost profit calculation done by IV Waste in the November St. Andrew Street Letter does not appear to use 41 months:

41 remaining months x $105 monthly fee = $4,305

Instead, IV Waste arrived at a lost profit calculation of $4,735.50, without any explanation for this increased amount. Additionally, IV Waste arrived at a total amount due for the St. Andrew Street Property of $9,885.50, without any explanation as to how it arrived at that amount when the only items alleged were lost profit in the amount of $4,735.50 plus a container removal fee of $150 (which, even if the lost profit amount were accurate, would only total $4,885.50).

Accordingly, we conclude that the trial court did not err in finding that IV Waste proved lost profits and consequential damages; however, the amount of $13,913.00 in lost profits and consequential damages is not supported by the record. Therefore, we vacate the trial court's judgment only as to the amount awarded, and we remand this matter to the trial court for a determination consistent with this Opinion as to IV Waste's correct amount of lost profits and consequential damages.

### Assignment of Error Number Four: Cancellation of Contracts by IV Waste

Hotard Properties, in its fourth assignment of error, argues that "[t]he trial court erred in finding [Hotard Properties] liable for damages after the contract had been cancelled by [IV Waste]." In support of this assignment of error, Hotard Properties points to the October Text Conversation between Mr. Hotard and Mr.

Torres V. Hotard Properties contends that further support for a finding that IV Waste cancelled the Contracts is the fact that IV Waste picked up its containers from the Rye Street and St. Andrew Street Properties which thereby concluded service by IV Waste. Additionally, Hotard Properties argues that the January and February Letters sent by IV Waste to Hotard Properties confirmed that IV Waste cancelled the Contracts. Countering, IV Waste contends that Ms. Tufaro's testimony supports the finding that Hotard Properties cancelled the contracts first by breaching them by failing to provide proper access to containers. We have already concluded in assignment of error number two that the trial court did not manifestly err in finding that IV Waste proved that Hotard Properties breached the Contracts. However, to resolve this fourth and final assignment of error, we must determine whether the trial court erred in finding that Hotard Properties breached the Contracts *before* any alleged cancellation of the Contracts by IV Waste.

Because this involves the issue of breach of contract again, as previously stated, our standard of review is manifest error. Also as previously iterated, if there is conflicting testimony, we will not disturb the trial court's reasonable evaluations of credibility and inferences of fact. *Rosell*, 549 So.2d at 844. Additionally, under this standard of review, if there are two permissible views of the evidence, the trial court's choice between them cannot be manifestly erroneous or clearly wrong. *Id.*

The record evidence presented in the matter *sub judice* provides conflicting testimony. One instance of conflicting testimony is in terms of whether the meeting at the Deer Field Road Property and the subsequent October Text Conversation about contract cancellation pertained solely to the Deer Field Road Property (as Ms. Tufaro contended) or whether it pertained to the St. Andrew Street and Rye Street Properties too (as Mr. Hotard contended). When questioned about the fact

39

that the October Text Conversation used the word "contract" (singular) after the parties had just recently met and discussed cancelling the Deer Field Road Property, Mr. Hotard did not have an explanation for this. Additionally, in terms of Hotard Properties' contention that the October Text Conversation constituted a cancellation of the St. Andrew Street and Rye Street Contract, we point to the Term Provision of the Contract. It stated that the term of the Contracts was for five years "unless either party g[ave] a written termination notice by certified mail ninety (90) days before a term's expiration." Clearly, the October Text conversation did not constitute termination notice by certified mail, so Hotard Properties should not have relied on it as a cancellation of the Contracts as Mr. Hotard purports to have done.

Another conflict in the testimony is about why the containers were missing in the first place. With regard to Hotard Properties' contention that IV Waste cancelled the Contracts by picking up the containers, Ms. Tufaro testified, "We did not pick up our cans. They disappeared." Thus, Ms. Tufaro's testimony indicated that the reason the containers were missing when the drivers went to service them was the fault of Hotard Properties, not because IV Waste had already picked them up after the dispute between the parties. By contrast, Mr. Hotard's testimony indicated that the containers were only missing once IV Waste picked them up for good following the dispute between the parties.

Additionally, Hotard Properties argues on appeal that the January and February Letters sent by IV Waste to Hotard Properties confirmed that IV Waste cancelled the Contracts. However, Ms. Tufaro's testimony indicated that IV Waste sent the November Letters and subsequent January and February Letters only after

IV Waste could not locate the containers. That is, according to Ms. Tufaro, only after Hotard Properties breach the Contracts did IV Waste send the various letters.

Considering the foregoing, one permissible view of the evidence was that established by Ms. Tufaro's testimony: the Deer Field Road Property meeting and subsequent October Text Conversation pertained solely to cancellation of the contract for the Deer Field Road Property; IV Waste did not remove the containers until after Hotard Properties breached the Contracts by failing to provide proper access to the containers as required by the Contracts (i.e., the containers were missing when IV Waste drivers arrived to service them); and IV Waste did not send any of its letters until after Hotard Properties breached the Contracts. Under our standard of review, the trial court's choice between Ms. Tufaro's testimony and Mr. Hotard's testimony cannot be manifestly erroneous or clearly wrong; so we conclude that this assignment of error is without merit. The trial court was not manifestly erroneous or clearly wrong in finding that Hotard Properties had already breached the Contracts before any purported actions taken by IV Waste that may have demonstrated cancellation of the Contracts.

**DECREE**

For the foregoing reasons, we affirm the trial court's July 12, 2023 judgment, which held that Hotard Properties breached its Contracts with IV Waste. Because we find that the trial court did not err in finding that IV Waste proved lost profits and consequential damages but that the amount of $13,913.00 in lost profits and consequential damages is not supported by the record, we vacate the trial court's judgment only as to the amount awarded. Further, we remand this matter to the trial court for a determination consistent with this Opinion as to IV Waste's correct amount of lost profits and consequential damages.

**AFFIRMED IN PART; VACATED IN PART; AND REMANDED**